UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

IN THE MATTER OF THE SEARCH OF
INFORMATION THAT IS STORED AT
PREMISES CONTROLLED BY GOOGLE,
LLC, 1600 AMPHITHEATRE PARKWAY,
MOUNTAIN VIEW, CALIFORNIA 94043

Case No. 1:21-MJ- 145-01-AJ

**Filed Under Seal – Level II**

## AFFIDAVIT

I, John Forte, having been duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a warrant to search information that is stored at premises controlled by Google, LLC, an electronic communication service and remote computing service provider headquartered in Mountain View, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Google, LLC to disclose to the government the information further described in Attachment B.I.  The government will then review that information and seize the information that is further described in Attachment B.II.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice, and have been so employed since 2002. I am currently assigned to the ATF Boston Field Division, Manchester, New Hampshire Field Office, and charged with investigating criminal offenses involving the federal firearms, explosives, arson, alcohol, and tobacco diversion laws.

3.      I have received extensive training in the federal firearms laws and am familiar with ATF's regulations regarding the purchase and sales of firearms.  I have successfully

completed the Criminal Investigations Training Program and the ATF New Professional Training (NPT) at the Federal Law Enforcement Training Center in Glynco, GA.  During the NPT program, I learned how to investigate criminal offenses involving the federal firearms, explosives, arson, alcohol, and tobacco diversion laws.  I have received advanced training with regard to conducting complex firearms trafficking investigations.  I have participated in dozens of investigations relating to the illegal acquisition and sales of firearms, the illegal manufacture and possession of National Firearms Act weapons and previously have sworn out numerous affidavits in support of search warrants and arrest warrants in firearms cases.  I have been certified as an Interstate Nexus Expert, that is, an expert in establishing whether particular firearms or ammunition have traveled in interstate commerce thereby satisfying the interstate commerce element of many federal firearms crimes.

4.       The information contained within this affidavit is based upon my training, experience, and investigation, as well as information that has been conveyed to me by other law enforcement officers and witnesses.  The following is either known to me personally or has been related to me by persons having direct knowledge of the events described below, including other law enforcement officers involved in this investigation.  Since this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation.

5.       Based on the facts set forth in this affidavit, there is probable cause to search the information described in Attachment A for evidence of violations of Title 18, United States Code, United States Code, Section 922(u), theft of a firearm(s) from a Federal firearms licensee (hereinafter, "FFL").  Based on the facts set forth in this affidavit, I submit there is probable cause that violations of 18 U.S.C. §922(u) occurred.

2

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of

competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) &

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has

jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND RELATING TO GOOGLE, LLC AND RELEVANT TECHNOLOGY

7.      Based on my training and experience, I know that cellular devices, such as mobile

telephones, are wireless devices that enable their users to send or receive wire and/or electronic

communications using the networks provided by cellular service providers.  Using cellular

networks, users of many cellular devices can send and receive communications over the Internet.

8.      I also know that many devices, including but not limited to cellular devices, have

the ability to connect to wireless Internet ("wi-fi") access points if the user enables wi-fi

connectivity.  These devices can, in such cases, enable their users to send or receive wire and/or

electronic communications via the wi-fi network.  A tablet such as an iPad is an example of a

device that may not have cellular service but that could connect to the Internet via wi-fi.  Wi-fi

access points, such as those created through the use of a router and offered in places like homes,

hotels, airports, and coffee shops, are identified by a service set identifier ("SSID") that functions

as the name of the wi-fi network.  In general, devices with wi-fi capability routinely scan their

environment to determine what wi-fi access points are within range and will display the names of

networks within range under the device's wi-fi settings.

9.      Based on my training and experience, I also know that many devices, including

many cellular and mobile devices, feature Bluetooth functionality.  Bluetooth allows for short-

range wireless connections between devices, such as between a device such as a cellular phone

or tablet and Bluetooth-enabled headphones.  Bluetooth uses radio waves to allow the devices to

exchange information.  When Bluetooth is enabled, a device routinely scans its environment to

identify Bluetooth devices, which emit beacons that can be detected by devices within the

Bluetooth device's transmission range, to which it might connect.

10.     Based on my training and experience, I also know that many cellular devices,

such as mobile telephones, include global positioning system ("GPS") technology.  Using this

technology, the device can determine its precise geographical coordinates.  If permitted by the

user, this information is often used by apps installed on a device as part of the apps' operation.

11.     Based on my training and experience, I know Google, LLC is a company that,

among other things, offers an operating system ("OS") for mobile devices, including cellular

phones, known as Android.  Nearly every device using the Android operating system has an

associated Google, LLC account, and users are prompted to add a Google, LLC account when

they first turn on a new Android device.

12.     In addition, based on my training and experience, I know that Google, LLC offers

numerous apps and online-based services, including messaging and calling (e.g., Gmail,

Hangouts, Duo, Voice), navigation (Maps), search engine (Google, LLC Search), and file

creation, storage, and sharing (e.g., Drive, Keep, Photos, and YouTube).  Many of these services

are accessible only to users who have signed into their Google, LLC accounts.  An individual can

obtain a Google, LLC account by registering with Google, LLC, and the account identifier

typically is in the form of a Gmail address (e.g., example@gmail.com).  Other services, such as

Maps and YouTube, can be used with limited functionality without the user being signed into a

Google, LLC account.

13.     Based on my training and experience, I also know Google, LLC offers an Internet

browser known as Chrome that can be used on both computers and mobile devices. A user has the ability to sign-in to a Google, LLC account while using Chrome, which allows the user's bookmarks, browsing history, and other settings to be uploaded to Google, LLC and then synced across the various devices on which the subscriber may use the Chrome browsing software, although Chrome can also be used without signing into a Google, LLC account. Chrome is not limited to mobile devices running the Android operating system and can also be installed and used on Apple devices and Windows computers, among others.

14.     Based on my training and experience, I know that, in the context of mobile devices, Google, LLC's cloud-based services can be accessed either via the device's internet browser or via apps offered by Google, LLC that have been downloaded onto the device. Google, LLC apps exist for, and can be downloaded to, devices that do not run the Android operating system, such as Apple devices.

15.     According to my training and experience, as well as open-source materials published by Google, LLC, I know that Google, LLC offers accountholders a service called "Location History," which authorizes Google, LLC, when certain prerequisites are satisfied, to collect and retain  a record of the locations where Google, LLC calculated a device to be based on information transmitted to Google, LLC by the device. That Location History is stored on Google, LLC servers, and it is associated with the Google, LLC account that is associated with the device. Each accountholder may view their Location History and may delete all or part of it at any time.

16.     Based on my training and experience, I know that the location information collected by Google, LLC and stored within an account's Location History is derived from sources including GPS data and information about the wi-fi access points and Bluetooth beacons

within range of the device.  Google, LLC uses this information to calculate the device's estimated latitude and longitude, which varies in its accuracy depending on the source of the data.  Google, LLC records the margin of error for its calculation as to the location of a device as a meter radius, referred to by Google, LLC as a "maps display radius," for each latitude and longitude point.

17.    Based on open-source materials published by Google, LLC and my training and experience, I know that Location History is not turned on by default.  A Google, LLC accountholder must opt-in to Location History and must enable location reporting with respect to each specific device and application on which they use their Google, LLC account in order for that usage to be recorded in Location History.  A Google, LLC accountholder can also prevent additional Location History records from being created at any time by turning off the Location History setting for their Google, LLC account or by disabling location reporting for a particular device or Google, LLC application.  When Location History is enabled, however, Google, LLC collects and retains location data for each device with Location Services enabled, associates it with the relevant Google, LLC account, and then uses this information for various purposes, including to tailor search results based on the user's location, to determine the user's location when Google, LLC Maps is used, and to provide location-based advertising.  As noted above, the Google, LLC accountholder also has the ability to view and, if desired, delete some or all Location History entries at any time by logging into their Google, LLC account or by enabling auto-deletion of their Location History records older than a set number of months.

18.    Location data, such as the location data in the possession of Google, LLC in the form of its users' Location Histories, can assist in a criminal investigation in various ways.  As relevant here, I know based on my training and experience that Google, LLC has the ability to

determine, based on location data collected and retained via the use of Google, LLC products as described above, devices that were likely in a particular geographic area during a particular time frame and to determine which Google, LLC account(s) those devices are associated with. Among other things, this information can indicate that a Google, LLC accountholder was near a given location at a time relevant to the criminal investigation by showing that his/her device reported being there.

19.     Based on my training and experience, I know that when individuals register with Google, LLC for an account, Google, LLC asks subscribers to provide certain personal identifying information.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, this information often provide clues to their identity, location, or illicit activities.

20.     Based on my training and experience, I also know that Google, LLC typically retains and can provide certain transactional information about the creation and use of each account on its system. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, Google, LLC often has

records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

21.     Google, LLC assigns an "anonymized" number, known as the Device ID, to a device, and the location data associated with a Device ID is never deleted.  These data are available to law enforcement through the issuance of a probable cause search warrant.  To obtain this information, Google, LLC requires a timeframe and general location, established either through a latitudinal/longitudinal point with a given radius or a polygon-shaped area with the latitude and longitude for each point of the polygon.

## BARN STORE OF NEW ENGLAND FIREARM THEFT

22.     On April 23, 2021, at approximately 1603 hours, a silver colored Chevrolet Silverado, four-door pickup truck, with black fender flares and black tire rims pulled into the driveway of the Barn Stores of New England, a federal firearms licensee or "FFL," located at 96 Old Turnpike Road in Salisbury, NH. Shortly after a Caucasian male, with a thin to average build, is seen walking into the store via the front entrance.  The suspect is wearing a backwards facing two-tone baseball hat with a logo, a black COVID-19 face mask, a blue jacket, black athletic pants, and red sneakers.

23.     At approximately 1605 hours, the suspect is seen to pick up a Smith & Wesson, model M&P 15-22, .22 caliber rifle, S/N LAA7327 of the floor display rack.  The suspect body position is such that his back is to the store employee in the firearms section who at that time is assisting other customers.  The suspect closes the multi-position shoulder stock on the rifle to its smallest position, then pulls the rifle closest to his body, and then walks out of the firearms area

8

into the rear aisle of the store all while keeping his back to the employee in the firearms section. The suspect can then be seen on a different camera in the rear aisle of the store position the rifle under his coat and walk toward the restroom.  The suspect entered the restroom and remained there for approximately three minutes and then emerged from the restroom.  The suspect walked back down the rear aisle, through the firearms section, and out the front door.

24.     At approximately 1618 hours, the suspect re-entered the store via the front door. At approximately 1622 hours, the suspect can be seen on video surveillance exit an aisle into the rear aisle holding a box for a Night Stick Area Light and then enters another aisle.  Shortly after, the suspect exits that aisle with the Night Stick Area Light removed from the box.  The suspect then placed the box down at the end of another aisle.  The suspect then turns to face the rear of the store, places the Night Stick Area Light inside his coat, and then zips the coat up.  The suspect left the store shortly after at approximately 1623 hours.

25.     At approximately 1623 hours, what is presumed to be the same truck exited the driveway of the Barn Stores of New England.

26.     On May 10, 2021, the manager of the Barn Store of New England contacted the New Hampshire State Police (NHSP) and ATF to report the theft of the firearm.  The manager advised that through the video surveillance system review, it was determined that the firearm was stolen on April 23, 2021.  The manager stated that the theft was not realized until May 10, 2021.

27.     On May 12, 2021, this affiant obtained and reviewed the video surveillance from Barn Stores of New England.  This affiant also obtained a copy of the ATF Theft/Loss Report completed by the Barn Store of New England regarding the theft.

28.     On that same day, this affiant took still pictures from the video of both the suspect

vehicle and the suspect.  This affiant sent the pictures in an email to a number of police

departments in the area of The Barn Store of New England including Chief Joseph Mahoney of

the Andover, NH Police Department and Chief David Suckling of the Danbury, NH Police

Department.

29.     Later that same day, Chief Mahoney contacted this affiant and advised that he

believed the vehicle was Devin KANE's and that the suspect pictured matched the physical

description of KANE.  Chief Mahoney advised that he personally knew KANE, as they went to

high school together.  Chief Mahoney further advised that earlier this year, he assisted NHSP and

Bristol, NH Police Department with an investigation which involved KANE and the truck

matching the description of the suspect vehicle.

30.     On that same day, this affiant spoke to Det. Barry Tanner at the Bristol, NH

Police Department.  Det. Tanner advised that they have an open drug trafficking case on KANE

and that he is a known user of controlled substances.  Det. Tanner stated that on February 18,

2021, they arrested KANE and photographed KANE's truck in relation to their investigation.

Det. Tanner sent this affiant four photographs taken of KANE's vehicle.  S/A Forte noted that at

the time the Bristol PD photographs were taken, KANE had a temporary registration on the

vehicle.  This affiant noted that the color, make, model, tire rim color and fender flare style/color

all matched the suspect vehicles.

31.     On that same day, this affiant obtained the registration for KANE's truck which

showed the truck was issued registration number 4785191 and is also registered to Douglas Kane

(DOB 11/24/1948).  The vehicle registration address is 240 Hobart Hill Road, Hebron, NH.  The

registration lists the vehicle as a 2014 Chevrolet Silverado 1500 pickup truck, silver colored, and

bearing VIN 3GUKSEC6EG121841.  The registration indicated it was issued on February 20,

2021 and expires on July 31, 2021.  This affiant also obtained KANE's New Hampshire driver's

license information which was last issued on July 14, 2016.  KANE's driver's license

information indicates that he is approximately 5'10" tall, 180 pounds, and resides at 240 Hobart

Hill Road in Hebron, NH.

32.     On that same day, this affiant reviewed KANE's criminal history and noted

numerous misdemeanor convictions for drug possession, willful concealment, and theft by

unauthorized taking.

33.     On that same day, NHSP Trooper Kevin McGregor advised this affiant that

KANE's phone number was 603-387-9854.  Trooper McGregor further advised that NHSP had

two cases on KANE in the last eighteen months and they were both for theft.

34.     On May 13, 2021, Chief Suckling contacted S/A Forte and advised that he

believed the suspect vehicle was KANE's.  Chief Suckling advised KANE's truck matched the

suspect vehicle from the Barn Store of New England theft.  Chief Suckling further advised that

the suspect matched the rough physical description of KANE.  Chief Suckling stated that he had

recent contact with KANE on April 24, 2021.  Chief Suckling advised that the contact occurred

after KANE's vehicle left a residence that was suspected in local drug trafficking.

35.     On that same day, Special Agent Patrick Dawley and this affiant received

information that KANE and the suspect vehicle were at 258 Bay Hill Road in Northfield, NH.

This affiant and S/A Dawley drove past the residence twice at approximately 1521 hours on that

same day and made a positive identification of KANE and his vehicle.

36.     On the same day, Det. Tanner provide this affiant with a phone number for KANE

of 603-387-9854.

## TECHNICAL INFORMATION

37.     On May 19, 2021, I identified the following coordinates for Target Location #1,

being 96 Old Turnpike Road in the town of Salisbury, NH.  Target Location #1 is the

geographical area identified as a polygon defined by the following latitude/longitude coordinates

and connected by straight lines:



Point 1: 43.373934, -71.699148

Point 2: 43.369505, -71.694427

Point 3: 43.368148, -71.694685

Point 4: 43.370643, -71.701444

Point 5: 43.374168, -71.704662

38.     The information is being requested during the following time periods in which

investigators believe the suspect may have previously visited the FFL, on April 23, 2021 from

approximately 4:03 PM through 4:23 PM.

39.     On May 19, 2021, I identified the following coordinates for Target Location #2, being 240 Hobart Hill Road in the town of Hebron, NH. Target Location #2 is the geographical area identified as a polygon defined by the following latitude/longitude coordinates and connected by straight lines:



Point 1: 43.682433, -71.820148

Point 2: 43.681704, -71.817713

Point 3: 43.679516, -71.820910

Point 4: 43.681137, -71.822165

40.     The information is being requested during the following time periods in which investigators believe the suspect may have visited, on April 23, 2021 from 10:00 PM through April 24, 2021 at 2:30 AM.

41.     This application requests a warrant as the first step of a two-step process. The data being provided in the execution of the requested warrant is anonymized. Google, LLC would only provide the "Device ID" information and there is no method for this affiant or other law enforcement investigators to identify the related user(s) of the device(s) with this

information alone.  Once the data have been received from Google, LLC, investigators will process the data to identify any "Device ID(s)" that appear to be related to the specific crime being investigated, based on the presence or absence of the devices at specific times.  If relevant "Device ID(s)" are identified, an application for a second search warrant related to the specific "Device ID(s)" that were discovered will be submitted to seek additional identification information in reference to those "Device ID(s)."  This additional information may include owner/user identifiers, extended location history, and/or additional device identifiers.

## CONCLUSION

Based on the foregoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google, LLC, who will then compile the requested records at a time convenient to it, and because this warrant seeks only permission to examine electronic records and does not involve the intrusion onto physical premises, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

/s/ John Forte
John Forte
Special Agent, ATF

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: June 4, 2021
Time:  3:21 PM, Jun 4, 2021

Hon. Andrea K. Johnstone
United States Magistrate Judge

14

## ATTACHMENT A

### Property To Be Searched

This warrant is directed to Google, LLC LLC and applies to:

(1) Location History data, sourced from information including GPS data and information about visible wi-fi points and Bluetooth beacons transmitted from devices to Google, LLC, reflecting devices that Google, LLC calculated were or could have been (as indicated by margin of error, *i.e.,* "maps display radius") located within the geographical region bounded by the latitudinal and longitudinal coordinates, dates, and times below ("Initial Search Parameters"); and

(2) identifying information for Google, LLC Accounts associated with the responsive Location History data.

### Initial Search Parameters

Search Parameter 1 – 96 Old Turnpike Road, Salisbury, New Hampshire

- Date: April 23, 2021

- Time Periods (including timezone):
  - 3:50 PM EST through 4:35 PM EST

- Target Location:   Geographical area identified as:

  - A polygon defined by the following latitude/longitude coordinates connected by straight lines:



- Point 1: 43.373934, -71.699148

- Point 2: 43.369505, -71.694427

- Point 3: 43.368148, -71.694685

- Point 4: 43.370643, -71.701444

- Point 5: 43.374168, -71.704662


Search Parameter 2 – 240 Hobart Hill Road, Hebron, New Hampshire

- Date: April 23 and 24, 2021

- Time Periods (including timezone):
  o 10:30 PM EST on April 23, 2021 through 2:30 AM EST on April 24, 2021

- Target Location:   Geographical area identified as:

  o A polygon defined by the following latitude/longitude coordinates connected

    by straight lines:



- Point 1: 43.682433, -71.820148

- Point 2: 43.681704, -71.817713

- Point 3: 43.679516, -71.820910

- Point 4: 43.681137, -71.822165

## ATTACHMENT B

### Particular Items to Be Seized

**I.      Information to be disclosed by Google, LLC**

The information described in Attachment A, via the following process:

1.      Google, LLC shall query location history data based on the Initial Search Parameters specified in Attachment A.  For each location point recorded within the Initial Search Parameters, and for each location point recorded outside the Initial Search Parameters where the margin of error (*i.e.*, "maps display radius") would permit the device to be located within the Initial Search Parameters, Google, LLC shall produce to the government information specifying the corresponding unique device ID, timestamp, location coordinates, display radius, and data source, if available (the "Device List").

2.      The government shall review the Device List and identify to Google, LLC the devices about which it seeks to obtain Google, LLC account identifier and basic subscriber information.  The government may, at its discretion, identify a subset of the devices.

3.      Google, LLC shall disclose to the government identifying information, as defined in 18 U.S.C. § 2703(c)(2), for the Google, LLC Accounts associated with each device ID appearing on the Device List about which the government inquires.

**II.      Information to Be Seized**

All information described above in Section I that constitutes evidence of violations of Title 18, United States Code, Sections 371 and 924(u), conspiracy and theft of firearm(s) from a Federal firearms licensee, have been committed on April 2, 2021 and April 5, 2021 involving unknown person(s).